[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-12733

_____

MARIE PATTERSON,

Plaintiff-Appellant,

*versus*

GEORGIA PACIFIC, LLC,
ALABAMA RIVER CELLULOSE, LLC,

Defendants-Appellees,

TIMOTHY MCILWAIN,
et al.,

Defendants.

————————————

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:18-cv-00492-JB-MU

————————————

Before ROSENBAUM, JILL PRYOR, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Our previous opinion, *Patterson v. Ga. Pacific, LLC*, No. 20-12733, 2022 WL 2311665 (11th Cir. June 28, 2022), in this case is vacated and this one is substituted in its place.*

Jacqueline Marie Patterson was working as a human resources manager for Georgia Pacific when she gave deposition testimony in a pregnancy discrimination lawsuit against her former employer. A week after finding out that she had testified against her former employer, Georgia Pacific fired her. Patterson then sued Georgia Pacific for unlawfully retaliating against her in violation of Title VII.

———————

* We take this action because the Equal Employment Opportunity Commission, which has appeared as amicus curiae, has brought to our attention a non-dispositive error in our previous opinion that needs correcting. *See generally Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843 (2019). The only revisions being made are to the second and third sentence of the third paragraph of Part III of the opinion, and to what was the last sentence of the third paragraph of Part III A of it.

The district court granted summary judgment to Georgia Pacific because it interpreted Title VII's anti-retaliation provision as inapplicable for two reasons.  One reason was its belief that the provision does not apply to HR managers acting in the course of their employment duties, even if their actions would otherwise be protected activity.  The other reason was the court's belief that an employee's actions involving a former employer were not protected conduct for purposes of applying the anti-retaliation provision to a current employer.  Patterson has appealed.

Georgia Pacific defends the summary judgment in its favor on the two grounds the district court gave, and also puts forward three grounds that the court did not reach, contending that: Patterson's complaint goes beyond the scope of her EEOC charge; she has not established a genuine issue of material fact on causation; and she has not established a genuine issue of material fact on pretext.

The district court erred on both grounds it gave for entering summary judgment against Patterson.  The three additional grounds that Georgia Pacific argues in an attempt to save it won't.  Reversal is in order.

## I.  FACTUAL BACKGROUND

At this stage of the proceedings, "we are required to view the evidence and all factual inferences therefrom in the light most favorable to [Patterson], and [to] resolve all reasonable doubts about the facts in [her] favor." *Feliciano v. City of Miami Beach*,

707 F.3d 1244, 1247 (11th Cir. 2013) (quotation marks omitted). We are neither required nor permitted to determine whose version of any disputed fact is actually correct, or more likely to be; our task is only to determine whether Patterson's version has evidence to support it. *Id.* at 1247–48 ("[W]e are required to credit [the plaintiff's] version if there is any evidence to support it, and it is that version we set out here."). With that in mind, here are the facts for summary judgment purposes.

Georgia Pacific hired Patterson in late December 2015 to work as a senior HR manager. She was assigned to the company's Alabama River Cellulose mill in Perdue Hill, Alabama. Her supervisor, who worked out of an Atlanta office and sometimes visited the Alabama River mill, was Jeffrey Hawkins, Georgia Pacific's HR director. Timothy McIlwain was the Alabama River mill's plant manager.

Before working at Georgia Pacific, Patterson had been a "Human Resources Business Partner II" at Memorial Hermann Health System. Her job responsibilities there had included managing employee complaints, giving advice about employment matters, and helping with employment law compliance.

In June of 2017, Patterson met with Georgia Pacific plant manager McIlwain and told him she believed two black employees had been passed over for job opportunities that they were qualified for and that they may have a valid race discrimination complaint. McIlwain responded by telling her, "Because of who you are you

are not going to tell me how to run this mill!" He then told her to leave his office.

On June 28 McIlwain told Hawkins, the HR director, that he had been having difficulty contacting Patterson at the mill and had been unable to determine how often she was physically present there. According to Hawkins, another HR manager had also complained to him around that time about having difficulty contacting Patterson.

McIlwain also told Hawkins on June 28 that there were rumors the Alabama River mill employees might form a union. Stopping that from happening was a priority for management, so Hawkins asked Patterson to schedule an emergency management meeting about it for the next day, June 29. Patterson told Hawkins she couldn't schedule the meeting for that date because she had to attend a deposition on the 29th.

Hawkins assumed, without asking Patterson, that the deposition had to do with Georgia Pacific and that she would merely be sitting in on it in her role as an HR manager for the company. Because of that assumption, he found it "confusing" when Georgia Pacific's legal department later told him there were no Georgia Pacific depositions on the 29th. He asked the HR Administrator, Jessie Jackson, what Patterson's Outlook calendar said on the 29th. Jackson told him it said "deposition" but that the calendar entry didn't have any details. Hawkins ended up scheduling the management meeting himself for June 30.

Patterson's deposition on June 29 did not involve Georgia Pacific. It was in connection with a Title VII lawsuit that had been filed against Memorial Hermann by three plaintiffs who claimed that they had been fired because they were pregnant. The plaintiffs deposed Patterson because she had been an HR manager at Memorial Hermann at the time they were fired and when they had filed their EEOC charges.

In her deposition, Patterson testified that at and around the time Memorial Hermann terminated the plaintiffs she had been part of several meetings and discussions about their terminations. When her bosses at Memorial Hermann decided to fire the plaintiffs, Patterson testified, she had advised them "not to do anything" until she could consult with another HR advisor because she was worried that firing the pregnant employees could raise FMLA issues and violate their rights. On the day she was deposed in connection with the Memorial Hermann lawsuit, Patterson did some work for Georgia Pacific before her deposition began, and she was on the phone in connection with Georgia Pacific-related business during the drive to and from the deposition.

On June 30, the day after the Memorial Hermann deposition, Patterson attended Georgia Pacific's emergency management meeting about the potential unionization at the Alabama River mill. At that meeting she was tasked with helping McIlwain draft a union avoidance plan; specifically, she was given the task of writing a report on compensation issues. There was no specific

deadline for the assignment, but Patterson understood that it was urgent and should be done sooner rather than later.

On July 3 Patterson went on a week-long vacation, but she still worked on her report and communicated with McIlwain about it during that week. Between July 10 and July 12 Patterson emailed Hawkins and McIlwain her "timeline," some initial information about the compensation issues, and "some talking points." That same week, between July 10 and July 14, Patterson finished the assignment and emailed the result to Hawkins and McIlwain, and by July 19 it was ready for "final review" at a meeting with McIlwain.

McIlwain, meanwhile, told Hawkins that he had been unable to contact Patterson while she was on vacation and that she had provided him no help on the union avoidance plan. But, according to Patterson, she had worked with McIlwain on the union avoidance plan from her hotel room during her vacation. McIlwain did not mention that to Hawkins but instead told him that he had done all the work on the plan himself.

On July 10, based on what McIlwain had told him sometime during the week before, Hawkins obtained Patterson's security badge swipe records at the Alabama River mill's entrance. He believed those records would reveal when she entered and exited the mill's parking lot, thereby showing when she was at the mill. His review of three months' worth of those records led him to conclude that of the 25 previous workdays, Patterson did not badge in or out of the mill on 13 days and had taken half days on another 4 days.

On July 11 or 12 (we will assume July 12 for simplicity), Hawkins visited the Alabama River mill to look into why Patterson had been out of the office so often, why she had not completed her part of the union avoidance plan, and where she had been on June 29. At the mill, Hawkins first talked to HR Administrator Jackson. He asked her about the June 29 deposition that had been listed on Patterson's Outlook calendar, and Jackson told him the entry for the deposition was no longer on the calendar. That left Hawkins, in his words, "even more confused."

Hawkins then went to Patterson's office and asked her for details about the deposition she had attended on June 29. Patterson told him that "three female employees were terminated from [her] previous employer while on FMLA and had filed an EEOC case" and that each had been pregnant or had just given birth when fired. Hawkins asked Patterson in regard to her deposition testimony: "Did you support or go against the employer?" When Patterson told him she'd testified "on behalf of the ladies," as she put it, Hawkins told Patterson that meant she "went against" her previous employer and that her having done so "made things clear" to him.

After Hawkins left Patterson's office on July 12, HR Administrator Jackson told her that Hawkins had "tried to get [Jackson] to say things that [she] didn't know," but she had told him that Patterson had gone to a deposition on June 29 and she didn't know any details.

On July 18, Jackson emailed Hawkins that her last conversation with him "made [her] feel a little uncomfortable;" that she had

checked a phone log like he asked, was attaching a copy of the log; and that she "never would have said that [Patterson] was here if she wasn't."[1]  Hawkins emailed back to Jackson that she had been "so open and honest with [him] regarding the 'deposition event' that [he] completely believe[d her] perspective of what had transpired."  He also stated: "I am sure I will be back in [the mill] in the near future."  (He worked in Atlanta.)

The near future was the next day.  On July 19, a week after Hawkins had told Patterson that her testifying against her former employer "made things clear" to him, Hawkins and McIlwain went into Patterson's office at the mill and fired her.  They didn't give her a reason.  They did give Patterson a termination letter, but it did not state a reason either.  The letter did offer Patterson a $50,000 "special lump sum" payment if she, among other things, agreed not to bring any lawsuit against Georgia Pacific, including one under Title VII.  Although Patterson's and Hawkins' names were at the bottom of the letter, no one had signed it. Patterson rejected the offer.

---

[1] It appears that on the morning of July 3, 2017, Hawkins called the mill and asked Jackson if he could speak to Patterson, to which Jackson responded that Patterson was on the phone.  Hawkins, at least at that time, thought Jackson was lying, and this seems to be what Jackson's email was referring to.  Patterson went on vacation on July 3, but before leaving she came to the office for the morning and had spoken to Hawkins on the phone at some point.

## II.  PROCEDURAL HISTORY

Patterson, represented by counsel, filed an EEOC charge.  In a checkbox list of reasons for what the cause of discrimination was based on, Patterson checked "race" and "retaliation."  She also included two pages of factual allegations.  The allegations largely focused on Patterson speaking up about the two black Georgia Pacific employees not receiving job opportunities.  But it also discussed how she had given a deposition in a "federal Title VII pregnancy discrimination case" filed against her former employer and how Hawkins told her that her testifying against her former employer "made things clear" to him.  The EEOC issued a notice of right to sue.

Patterson then filed a pro se complaint (and later an amended complaint) alleging unlawful retaliation under Title VII.  Though the complaint did discuss as factual background the facts about the two black employees being passed over for job opportunities at Georgia Pacific, the only legal theory it asserted was that Patterson had been fired in retaliation for giving her Memorial Hermann deposition testimony, in which she opposed pregnancy discrimination.  After discovery, Georgia Pacific moved for summary judgment on four grounds: Patterson's complaint was beyond the scope of her EEOC charge, Patterson had not engaged in protected activity, Patterson had not created a genuine issue of material fact on causation, and Patterson had not created a genuine issue of material fact on pretext.

The district court granted summary judgment on two grounds. The first one was its conclusion that Patterson had not engaged in protected activity because she was an HR manager. The court relied on an unpublished opinion of this Court that held "the manager [exception was] persuasive and a viable prohibition against certain individuals recovering under Title VII." *Brush v. Sears Holdings Corp.*, 466 F. App'x 781, 787 (11th Cir. 2012) (unpublished). The manager exception, as recited in the *Brush* opinion and as quoted by the district court, provides: "a management employee that, in the course of her normal job performance, disagrees with or opposes the actions of an employer does not engage in 'protected activity.'" *Id.* at 787.

Applying the rule to Patterson, the district court concluded "there can be no reasonable dispute" that her "involvement in the termination of the former [Memorial Hermann] employees was solely in her capacity as . . . a human resources manager" there, and her activities, including giving the deposition, "were consistent with her managerial responsibilities" to her former employer. Because "[a]ny concern or opposition expressed by" Patterson to the pregnancy discrimination at Memorial Hermann was "within or directly related to" her "normal job performance" there, the court reasoned that she had not engaged in protected activity.

The court "alternatively conclude[d]" that Patterson had not engaged in protected activity because her opposition was not to Georgia Pacific's allegedly unlawful employment practices but to her former employer's practices. To be protected conduct, the

court ruled, a plaintiff's opposition had to be to the discriminatory actions or practices of the employer that did the retaliating, not to those of a former employer.  For want of a better name, we will call that rationale behind the district court's ruling "the current employer requirement."

## III.  ANALYSIS

Title VII's anti-retaliation provision makes it "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  The first part of that provision, ending at the first comma in the quotation, is called the "opposition clause." *See Gogel v. Kia Motors Mfg. of Ga. Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc).  The second part is called the "participation clause." *Id.*  Both clauses are implicated in this case.

We apply a burden shifting framework to Title VII retaliation claims. *Id.* at 1135.  The plaintiff must first make out a prima facie case of retaliation, showing "(1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Id.* at 1134 (quotation marks omitted).  If the plaintiff can establish that, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason or reasons for the retaliation. *Id.* at 1135.  If the employer does, the plaintiff must show that each

reason is merely a pretext and that the real reason was retaliation. *Id.*

The parties raise several issues. Georgia Pacific contends that Patterson failed to administratively exhaust her remedies, which is the first contention we will address. Patterson contends that the district court erred in concluding that she did not engage in protected activity; she argues that the conduct for which she was fired was covered not only by the opposition clause but also by the participation clause. In addition to disputing that her conduct was covered by either clause, Georgia Pacific contends that Patterson has not created a genuine issue of material fact about causation or pretext.

Our review is *de novo*. *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) ("We review *de novo* a district court's grant of summary judgment, applying the same legal standards as the district court."); *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (reviewing *de novo* whether a complaint was beyond the scope of an EEOC charge).

## A. Exhaustion

Georgia Pacific contends that Patterson's claim is beyond the scope of her EEOC charge because her charge is almost entirely about race discrimination and not about pregnancy discrimination or the Memorial Hermann deposition.

Before filing a Title VII action, a plaintiff must file a charge of discrimination with the EEOC. *Gregory*, 355 F.3d at 1279.

14                    Opinion of the Court                    20-12733

Because of that exhaustion requirement, "a plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* at 1280 (quotation marks omitted). The facts alleged in the charge matter most for determining what can reasonably be expected to grow out of an EEOC charge; the legal theory the charging party articulates is far less important. *See id.*; *Batson v. Salvation Army*, 897 F.3d 1320, 1328 (11th Cir. 2018); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970) ("In the context of a statute like Title VII it is inconceivable that a charging party's rights should be cut off merely because he fails to articulate correctly the legal conclusion emanating from his factual allegations."). We do not strictly construe EEOC charges, and we are reluctant to allow procedural technicalities to bar Title VII claims. *Gregory*, 355 F.3d at 1280.

It may be fair to say that Patterson's EEOC charge largely focuses on race discrimination, but it would be unfair to say that's all it discusses and alleges. It also discusses how Patterson gave deposition testimony in a "federal Title VII pregnancy discrimination case filed against [her] former employer." And it recounts how Hawkins questioned her about that deposition, asked her why she "had testified against the company [she] used to work for," and stated that her giving the deposition "'made things clear' to him." "[U]nder the liberal EEOC charge strictures of" our precedent, *Gregory*, 355 F.3d at 1280, that is enough to bring within the scope of Patterson's EEOC charge the claim that she was fired in

retaliation for giving the Memorial Hermann deposition. Even though she also complained about race discrimination, Patterson "stated facts from which a reasonable EEOC investigator could have concluded that what she had complained about is retaliation because of her" giving the Memorial Hermann deposition. *Id.* She exhausted her EEOC remedies.

## B.  The Opposition Clause

### 1.  The Proposed Manager Exception

Now to the merits.  One of the bases on which the district court relied in granting summary judgment to Georgia Pacific was the so-called "manager rule."  It is more aptly described as the "manager exception" since it would except HR managers from the class of employees who are protected by Title VII's anti-retaliation provision.  That is how we will refer to it.

The district court concluded that under the manager exception Patterson had not engaged in protected activity in giving the Memorial Hermann deposition because she had been acting in relation to her job responsibilities as one of the HR managers of that company.  Assuming the court was right about the relation between Patterson's Memorial Hermann job duties and her deposition, the court still erred in applying a manager exception to bar the claim.  That rule has no basis in the text of Title VII's opposition clause and actually contradicts the text of it.

Before discussing the manager exception, we acknowledge that the district court relied on one of our unpublished opinions,

which had credited and applied it.  Our unpublished opinions are not precedential, so they do not bind us or district courts to any degree.  *See, e.g.*, *United States v. Izurieta*, 710 F.3d 1176, 1179 (11th Cir. 2013); 11th Cir. R. 36-2 (providing that our unpublished opinions are not binding precedent).  And nothing our unpublished *Brush* opinion had to say about the manager exception convinces us that it is a viable rule of law that should be applied to Title VII retaliation claims.

The manager exception did not originate in the context of Title VII, but in cases involving the Fair Labor Standards Act, or 29 U.S.C. § 215(a)(3).  *See, e.g.*, *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486–87 (10th Cir. 1996).  The FLSA prohibits retaliation against an employee "because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter."  29 U.S.C. § 215(a)(3).

But Title VII's text is different.  Instead of protecting employees who have "filed any complaint" or "instituted any proceeding," *id.*, Title VII's opposition clause protects any employee who "has opposed any practice made an unlawful employment practice," 42 U.S.C. § 2000e-3(a).  Congress did not copy and paste the language from FLSA into Title VII, so we should not simply copy and paste a rule from FLSA into Title VII.  *See DeMasters v. Carilion Clinic*, 796 F.3d 409, 422 (4th Cir. 2015) ("[W]e also must take care to respect any differences in language and purpose between Title VII and the FLSA before adopting a rule from one to the other.") (quotation marks omitted); *cf. Henson v. Santander*

*Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017) ("And, usually at least, when we're engaged in the business of interpreting statutes we presume differences in language like this convey differences in meaning.").

The manager exception must come from Title VII's text, if it is to come at all. *See, e.g.*, *Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 488 (11th Cir. 2015) (our only duty and power when enforcing a statute is to "give effect to the text Congress enacted") (emphasis removed). The text of Title VII's opposition clause extends its protection to "*any* of [the employer's] employees." 42 U.S.C. § 2000e-3(a) (emphasis added). Because Congress did not qualify the word "any," it means "all." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997) (participation clause); *Jackson v. Genesee Cnty. Rd. Comm'n.*, 999 F.3d 333, 345 (6th Cir. 2021) (reasoning that the opposition clause's use of "any" "suggests that all employees are subject to the same standard"); *see also, e.g.*, *United States v. Fox*, 926 F.3d 1275, 1279 (11th Cir. 2019); *United States v. Alabama*, 778 F.3d 926, 932–33 (11th Cir. 2015). HR managers fall into the category of "all employees," and the statutory definition of "employee" does not have any carveout or exclusion of HR managers that would remove them from the protection of the opposition clause. *See* 42 U.S.C. § 2000e(f). The clause applies to HR managers just as it does to other employees.

The statutory text does not indicate that any employee or category of employees, like HR managers, is to be analyzed under a special rule or subjected to a different legal standard than other

employees or categories of them.  The anti-retaliation provision applies the same to all employees.  Congress did not enact a rule based on job duties or exclude from protection any type of employee based on her job duties.

Instead of referring to job titles or duties, the key word in the opposition clause is "opposed."  *See* 42 U.S.C. § 2000e-3(a). Congress made the verb, not the noun, the key.  What matters is not the job duties or title of the employee but the actions or conduct that caused the retaliation against her.  *See Littlejohn v. City of New York*, 795 F.3d 297, 317 n.16 (2d Cir. 2015) ("The manager [exception]'s focus on an employee's job duties, rather than the oppositional nature of the employee's complaints or criticisms, is inapposite in the context of Title VII retaliation claims.").

The word "opposed" does not somehow sneak the manager exception into the statute.  "Opposed" as used in the opposition clause "carries its ordinary meaning," which includes "to resist or antagonize; to contend against; to confront; resist; withstand." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (cleaned up).  Whether an employee has "opposed" an unlawful employment practice depends on whether the employee's activity would be understood as opposition "in ordinary discourse" and in how "we would naturally use the word."  *Id.* at 277; *see also New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) ("It's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute.") (cleaned up); *CSX Corp.*

*v. United States*, 18 F.4th 672, 679 (11th Cir. 2021) ("The text must be interpreted consistently with its ordinary meaning at the time Congress enacted the statute.") (quotation marks omitted; alterations adopted).

The manager exception would carve out of Title VII protection the actions of management employees who have in the course of their normal job performance opposed an unlawful employment action of an employer. That carveout does not fit within the ordinary meaning of the word "opposed," and it is contrary to how Title VII uses the word. For one thing, the statute does not put any qualification on the word "opposed." It does not say an employee has engaged in protected activity unless her opposition came as part of her duties in the normal course of her employment.

Because it's not explicit in the text, to limit the plain meaning of "opposed," the manager exception would have to be implicit in how a person speaking "in ordinary discourse . . . would naturally use the word" opposed. *Crawford*, 555 U.S. at 277. But the limitations imposed on the word "opposed" by the manager exception would be neither "ordinary" nor "natural" to someone using that word. A person speaking "in ordinary discourse" would think an HR manager has opposed her employer's unlawful employment practices even if it's part of her job to do so. Opposition is opposition, whether the opposer is drawing a manager's salary or not.

It is too big a stretch to think that Congress silently and implicitly wrote into the opposition clause a significant exclusion of an entire category of employees, HR managers. We "assume that

Congress does not generally hide elephants in mouseholes." *CSX Transp., Inc. v. Ala. Dep't of Rev.*, 888 F.3d 1163, 1176 (11th Cir. 2018) (quotation marks omitted). That assumption is especially true here where the elephant would have to trample the ordinary and plain meaning of the words Congress did choose.

Both sides present competing policy arguments, or as Georgia Pacific calls them, "practical considerations" about whether there should be a manager exception. But however "practical" the policy considerations might be, making pronouncements about the prudence of the parties' policy preferences is not within the proper purview of judges. *See Noble State Bank v. Haskell*, 219 U.S. 575, 580 (1911) (on rehearing) (Holmes, J.) ("We fully understand . . . the very powerful argument that can be made against the wisdom of the legislation, but on that point we have nothing to say, as it is not our concern."). What we have said before applies here as well: we "render our decision today as a court interpreting the statute[] that Congress has enacted, not as policymakers." *In re Walter Energy, Inc.*, 911 F.3d 1121, 1156 (11th Cir. 2018).

And, one last time for good measure, as we've stated in a participation clause case where a policy concern was raised:

> [S]uch policy concerns cannot alter our interpretation
> and application of clear statutory language. . . . [I]t is
> up to Congress to make policy judgments about con-
> cerns such as th[ese]. Once Congress has expressed
> its resolution of such concerns in a statute, it is the
> duty of the courts to give effect to that resolution by

applying the statute according to its terms.  We can-
not refuse to give effect to the legislative will merely
because we think Congress has acted unwisely.

*Merritt*, 120 F.3d at 1188.  Whether a manager exception or the lack
of one is good, bad, or somewhere in between does not matter to
our decision.  What matters is whether the broad manager excep-
tion Georgia Pacific proposes is consistent with the statutory text
that Congress enacted.  It is not.

### 2.  The Proposed Current Employer Requirement

The district court alternatively ruled that Patterson did not
engage in protected activity "because her activity did not concern
unlawful employment practices of her [current] employer."  The
alleged employment practices that Patterson's deposition involved
were practices of Memorial Hermann, her former employer, not
those of Georgia Pacific, her later employer.  But it was Georgia
Pacific that allegedly retaliated against Patterson by firing her for
giving the deposition.

There is nothing in the anti-retaliation provision's opposi-
tion clause that permits an employer to retaliate against one of its
employees for opposing an unlawful employment practice of a for-
mer employer.  The clause forbids retaliation by "an employer"
against "*any* individual" for having "opposed *any* practice made an
unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-
3(a) (emphasis added).  It doesn't say "opposed any practice *of a
current employer* made an unlawful employment practice by [Title
VII]."  A former employer's unlawful employment practice is just

as much an unlawful employment practice as one of a current employer. The statutory text makes no distinction between the two. Opposition is opposition, and *any* unlawful employment practice is *any* unlawful employment practice.

And the entity that the statutory provision forbids from retaliating is "an employer," not just *the* employer whose unlawful employment practice the employee opposed. In this context, as is usually the case, the indefinite article "an" means "any." *See Alabama*, 778 F.3d at 933. Georgia Pacific is unquestionably "an employer," and at the time it allegedly retaliated by firing Patterson it was her employer.

We hold that under the opposition clause's plain language, a current employer may not retaliate for opposition clause conduct even if it is directed at or involves only a former employer. *See McMenemy v. City of Rochester*, 241 F.3d 279, 284 (2d Cir. 2001) ("We think that Title VII protects an employee from *any* employer, present or future, who retaliates against him because of his prior or ongoing opposition to an unlawful employment practice or participation in Title VII proceedings.").

The remaining question is whether Patterson "opposed any practice made an unlawful employment practice" under Title VII. She has created a genuine issue of material fact that she did. Patterson's testimony that she had opposed Memorial Hermann's alleged pregnancy discrimination while she was an HR manager there satisfies the ordinary meaning of "opposed;" it at least fits the

bill for "contend against." *Crawford*, 555 U.S. at 276 (quotation marks omitted).

Because neither the proposed manager exception nor the proposed current employer requirement saves Georgia Pacific from liability for unlawful employment practices, the district court erred in ruling that Patterson did not engage in activity that was protected under Title VII's opposition clause.

## C.  The Participation Clause

Alternatively, we hold that Patterson engaged in protected activity under the participation clause.  It is not clear from the district court's order whether it overlooked the participation clause claim or whether it applied the same interpretation to both the opposition and participation clauses.  Either way, Georgia Pacific is not entitled to summary judgment.

Patterson has raised her participation theory throughout the proceedings, and the plain text of the clause plainly covers her conduct.[2]  Just as with the opposition clause, neither the proposed

---

[2] Patterson in her appellate briefs raised and argued the issue that, regardless of the opposition clause, she engaged in protected activity under the participation clause.  Georgia Pacific chose not to respond to the merits of the argument, and instead argued in one paragraph that, when Patterson was acting *pro se* before the district court, she alleged only the opposition clause and not the participation clause.  We are unpersuaded by Georgia Pacific's argument.

We have reviewed Patterson's *pro se* complaint and are satisfied that under a liberal construction, it invoked the participation clause as a theory for her claim. *See Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998)

24                    Opinion of the Court                    20-12733

manager exception nor the proposed current employer require-
ment insulates Georgia Pacific from liability under the participa-
tion clause.  What we said about that proposed exception and that
proposed requirement in connection with the opposition clause ap-
plies with full force to the participation clause.  If anything, it is
even more apparent with the participation clause.

The relevant part of the participation clause forbids "*an* em-
ployer" from retaliating "against *any* of his employees . . . because
[s]he has made a charge, *testified*, assisted, or participated *in any
manner* in an investigation, *proceeding*, or hearing under [Title
VII]." 42 U.S.C. § 2000e-3(a) (emphasis added).  We've described
the participation clause as using "broad and unequivocal" language
that "is straightforward and expansively written." *Merritt*, 120 F.3d
at 1182, 1186. It is too straightforward, too unequivocal, and too

---

("Pro se pleadings are held to a less stringent standard than pleadings drafted
by attorneys and will, therefore, be liberally construed.").  The part of Patter-
son's complaint that lists her Title VII retaliation count states that she engaged
in the protected activity of opposing pregnancy discrimination, which invokes
the opposition clause.  And in the next sentence it alleges: "On June 27, 2017,
Plaintiff was deposed by her former employer where she opposed discrimina-
tory treatment."  Construing that sentence liberally, it is a reference both to
Patterson's participation in the deposition and the opposition she voiced dur-
ing it.  In the count of her complaint alleging retaliation, Patterson incorpo-
rated the complaint's preceding factual allegations, which had included her
"participation in the deposition," and Hawkins' reaction to it, including his
statement that her testifying against her former employer had "made things
clear to him."  Under the liberal construction we give to *pro se* complaints,
that's enough to invoke the participation clause.

expansively written to silently shelter a manager exception or to have a covert current employer requirement.

The genuine issues of material fact that Patterson has established make applying the participation clause simple. Georgia Pacific is "an employer" and Patterson is among "any" of its employees. She "testified . . . in any manner" by giving a deposition in a "proceeding" under Title VII, to wit: in a Title VII lawsuit. *See, e.g.*, *id.* at 1186 (collecting cases and holding that an employee who gave "deposition testimony, albeit reluctantly," had "participated" in a Title VII proceeding).

If Georgia Pacific fired Patterson for testifying in the deposition in the Title VII lawsuit against Memorial Hermann, it violated her rights under Title VII's participation clause. It does not matter that the lawsuit she participated in was against a former employer for whom she had been an HR manager. *See Flowers v. Columbia Coll. Chicago*, 397 F.3d 532, 534 (7th Cir. 2005) (holding that under the participation clause "[n]o employer may retaliate against someone who makes or supports a charge of discrimination against *any* employer").

## D.  Causation

Georgia Pacific contends that we can and should affirm on the alternative ground that there is no genuine issue of material fact that Patterson's termination was causally related to her protected activity of testifying in the deposition. But there is.

As we've mentioned, when determining whether there is a genuine issue of material fact that defeats summary judgment, we do not weigh conflicting evidence or make credibility determinations to resolve factual disputes. *See, e.g.*, *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1346 (11th Cir. 2021); *Grayson v. Warden*, 869 F.3d 1204, 1220 (11th Cir. 2017). Instead, "when conflicts arise between the facts evidenced by the parties, we must credit [the non-movant's] version." *Feliciano*, 707 F.3d at 1247 (quotation marks and emphasis omitted; alteration adopted). And that is true even if, as is often the case, the plaintiff's evidence consists primarily or solely of her own self-serving sworn statements or testimony. *See id.* at 1253 ("To be sure, [the plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."); *see also Price v. Time, Inc.,* 416 F.3d 1327, 1345 (11th Cir. 2005) ("Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.").

On the subject of self-serving sworn statements, Patterson attached to her motion opposing summary judgment a declaration that she swore under penalty of perjury was true and correct. *Cf.* 28 U.S.C. § 1746. In its summary judgment briefing to the district court, Georgia Pacific argued that Patterson's declaration should not be considered because she had not complied with certain local rules.

We have considered Patterson's declaration as evidence. For one thing, Georgia Pacific failed to argue in its extensive

briefing to us that we should not consider Patterson's declaration. It only did so at oral argument when we asked about the matter. "We do not consider arguments not raised in a party's initial brief and made for the first time at oral argument." *Green v. Graham*, 906 F.3d 955, 963 (11th Cir. 2018) (quotation marks omitted; alterations adopted). For another thing, there was no finding by the district court that the declaration was a sham, and there is nothing in the record to establish that it was. *Cf. Kernel Recs. Oy v. Mosley*, 694 F.3d 1294, 1300 n.6 (11th Cir. 2012) ("A district court may disregard an affidavit as a sham when a party to the suit files an affidavit that contradicts, without explanation, prior deposition testimony on a material fact.").

As part of her prima facie case of retaliation, Patterson must show "that the adverse action was causally related to the protected activity." *Gogel*, 967 F.3d at 1134 (quotation marks omitted). "To establish a causal connection, a plaintiff must show that the relevant decisionmaker was aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017) (quotation marks omitted). Patterson has produced enough causation evidence to avoid summary judgment on that element of her claim.

Georgia Pacific argues that Patterson told Hawkins only that the Memorial Hermann deposition had to do with an FMLA issue, not a Title VII one, which was not enough to make Hawkins aware that she had engaged in protected activity specifically under Title

VII. But Georgia Pacific cherry picks the record, and cherry picking will not harvest a summary judgment.

Patterson testified in her deposition for this lawsuit that when Hawkins asked her about the Memorial Hermann deposition, she "shared with him [that] it was for three ladies who were out on FMLA." Even assuming that would not be enough for a reasonable factfinder to infer that Hawkins was aware of Patterson's protected Title VII activity, Patterson's declaration expands on what she told Hawkins about the Memorial Hermann deposition. Her declaration states she told Hawkins that "three female employees were terminated from [her] previous employer while on FMLA and had filed an EEOC case" and "*that each of the ladies [was] pregnant or had just given birth at the time of termination.*" That's enough for a reasonable factfinder to infer that Hawkins knew that Patterson's Memorial Hermann deposition was related to a Title VII pregnancy discrimination lawsuit, which made it protected activity.

There is also other evidence of causation. Hawkins told Patterson that learning she had testified against her former employer "made things clear to him." And the very day before he fired Patterson, Hawkins sent an email to the HR Administrator referring to Patterson and "the 'deposition event'" involving her. Those are facts from which a reasonable factfinder could easily infer that Patterson's Memorial Hermann deposition was not "wholly unrelated" to her being fired.

There is also the close temporal proximity of one week between Hawkins learning about Patterson's protected activity and then firing her. "The general rule is that close temporal proximity between the employee's protected conduct and the [adverse action] is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000); *see also Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1268 (11th Cir. 2008) ("[T]he close temporal proximity between the two — Martin was terminated while on FMLA leave — is more than sufficient to create a genuine issue of material fact of causal connection."); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the [adverse action]."). The one-week proximity between Hawkins' learning about the Memorial Hermann deposition and firing Patterson is short enough to fall under the "general rule" of close temporal proximity. *See McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (holding that five days was sufficient circumstantial evidence of causation); *Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 601 (11th Cir. 1986) (same for one month). Especially since Hawkins spoke of her deposition the day before he fired her.

For those reasons, we reject Georgia Pacific's invitation to affirm on the alternative ground that Patterson has not created a genuine issue of material fact on causation. She has.

### E.  Pretext

Finally, Georgia Pacific contends that it is entitled to summary judgment because Patterson has not created a genuine issue of material fact about pretext. It argues that she has not met her burden of showing that its proffered reasons for firing her were "merely a pretext to mask retaliatory actions." *Gogel*, 967 F.3d at 1135 (quotation marks omitted; alteration adopted). But she has.

To show that an employer's given reasons are pretextual, a plaintiff must show "*both* that the reason was false, *and* that retaliation was the real reason." *Id.* at 1136 (quotation marks omitted; alteration adopted). At least where "the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it." *Id.* (quotation marks omitted). A plaintiff cannot rebut a reason "by simply quarreling with the wisdom of that reason" or substituting her "business judgment for that of the employer." *Chapman*, 229 F.3d at 1030. The plaintiff instead "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gogel*, 967 F.3d at 1136 (quotation marks omitted).

Georgia Pacific asserts as its legitimate, non-discriminatory reasons for firing Patterson "her poor performance and excessive absences." Its basis for the "poor performance" reason is Patterson's work on the union avoidance issue, and its basis for the "excessive absences" reason is Hawkins' compilation of Patterson's badge swipes at the mill. If true, those are legitimate, non-

discriminatory reasons that could motivate a reasonable employer, but Patterson has created a genuine issue of material fact about whether those reasons were the real ones that motivated Hawkins to fire her.

Patterson has met head on Georgia Pacific's contention that it fired her for poor performance on the union avoidance issue. To support that proffered reason, Georgia Pacific relies primarily on its assertion that Patterson failed to meet a July 7 deadline for her union avoidance assignment. It is true that Hawkins and McIlwain testified that there was a July 7 deadline. But Patterson testified that there was no deadline for her assignment, and it is her testimony we are to credit at this stage.

Not only that, but even though Hawkins spoke with Patterson on July 12, which was only five days after the claimed July 7 deadline, he did not mention to her during that conversation anything about the union avoidance assignment or her being late on it. Drawing inferences in Patterson's favor, as we must, given that Hawkins did not mention anything at all to her about her being late on that assignment, it is implausible that he was so upset about it that it is the reason he fired her. Not only that, but the facts, as we must view them now, are that Patterson worked on the union avoidance assignment while on a July 4th vacation, and she communicated with McIlwain about it during that time. Those facts further undercut Georgia Pacific's claim that she was fired for poor performance or nonperformance on the union avoidance plan. It is, at the least, an issue for the jury.

Patterson has also met head on Georgia Pacific's contentions about absences being the reason that she was terminated. She has produced evidence that Hawkins' inquiry into her absences did not follow Georgia Pacific's usual procedure for reviewing attendance issues. An employer's deviation from standard procedures can be evidence of pretext. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) ("[A]n employer's deviation from its own standard procedures may serve as evidence of pretext.").

In her declaration, Patterson, who was an HR manager, stated that using badge swipes is not how Georgia Pacific tracks attendance, and that it normally investigates attendance issues by looking at a full year to identify patterns. Hawkins' testimony confirms that his inquiry into Patterson's attendance deviated from what Patterson says were Georgia Pacific's normal procedures. Hawkins testified that he did not conduct an "impartial investigation" or any "investigation" into Patterson's absences, did not know how many of Patterson's available vacation days she had taken in 2017 (even though she was entitled to 15), and did not know how many absences she'd had from June 2016 through June 2017. Hawkins also failed to check Patterson's Outlook calendar to see if it explained her locations or absences, even though Patterson typically put her vacation days on it.

Additionally, Patterson states that she had never been questioned about her time away from the mill, that other employees had received warnings before being fired while she did not, and

that Georgia Pacific's policies call for a "progressive disciplinary process." As an HR manager, Patterson would know about that. And it is undisputed that Patterson received no warning, about her attendance or anything else, from Hawkins or anyone else before she was fired. That could be particularly telling given that Hawkins went to talk with her in her office on July 12, two days after he had investigated her badge swipes on July 10, but did not even mention to her anything about an attendance problem. Instead, he asked her why she had testified against her former employer and told her that her doing so "made things clear" to him. Construing that in the light most favorable to Patterson strongly suggests that what actually motivated Hawkins was not Patterson's alleged absences, but her giving deposition testimony that could hurt her former employer's interests.

There is other evidence contributing to the creation of a genuine issue of material fact on pretext. Patterson produced positive work performance reviews from 2016. Parts of those reviews had positive statements, describing her as a "self-starter" with "high initiative" who was committed to deadlines, and stating that she "[p]uts in a lot of hours and is available whether at work or home and is always willing to help." Those reviews are from fall 2016, which predates the summer 2017 events that are at issue in this case. Still, they do provide some basis for contradicting Georgia Pacific's claims that Hawkins believed Patterson had poor work performance, had ignored an important deadline, and had excessive absences. See *Barthelus v. G4S Gov't Sols., Inc.*, 752 F.3d 1309,

1315–17 (11th Cir. 2014) (holding there was a genuine issue of material fact about pretext when the employer claimed that it fired the plaintiff for poor performance but the plaintiff had produced, among other things, positive performance reviews).

Also, Patterson was given no reason for why she was fired, either in person when Hawkins fired her or in her termination letter. But she has produced a termination letter given to another HR employee and that letter, unlike Patterson's, states explicitly why that employee was being fired, which was for "culture fit, credibility, and resistance to change."

That termination letter to the other employee refers to her having been "warned of these concerns," which was a reference to three warnings plus a detailed final disciplinary notice given to the other employee a month before her termination. By contrast, before she was fired Patterson received no disciplinary warnings about anything. And Patterson in her declaration swears that Georgia Pacific's "HR Tool Kit" requires "that terminations should include a clear [and] accurate reason for termination." Construed in her favor and considered along with the other evidence of pretext, the evidence about Georgia Pacific's deviation from its normal policies and procedures and deviation from how it treated other employees establishes a genuine issue of material fact on pretext. See Hurlbert, 439 F.3d at 1299.

And then there are also Hawkins' own words. Just one week before firing her, he told Patterson that she had gone "against" her former employer and that her doing so "made things clear" to him.

And the very day before firing her, Hawkins sent an email to one of Patterson's coworkers referring to Patterson and the "deposition event." Those words from Hawkins himself are additional evidence that his actual reason for firing Patterson was the Memorial Hermann deposition and the reasons he gave later are pretextual. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1362 (11th Cir. 1999) ("Far from being a stray remark, the comment may evince probative evidence of the state of mind of the decision-maker at the time of [the plaintiff's] termination.").

Then there is the special lump sum payment of $50,000 that Patterson was offered if she agreed not to bring a Title VII lawsuit. She was offered that money even though Georgia Pacific claimed it was firing her for poor performance and excessive absences. In her declaration, Patterson states that while she was employed in Georgia Pacific's human resources department, she had "never heard of or participated in a 'for Cause' Termination [where] the person was offered a severance or out placement assistance." Her statement about that is consistent with the termination letter given to another employee, which includes no indication that the other employee, who was terminated for cause, was to receive any severance or "special lump sum payment." Georgia Pacific has presented no evidence that offering such special lump sum payments in return for waiving any Title VII remedy is the company's practice, nor has it explained why the offer was made to Patterson.

Finally, as we mentioned when discussing causation, there is the temporal proximity of Patterson being fired one week after

Hawkins learned of her protected activity.  That can also be evidence of pretext.  *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 925–26 (11th Cir. 2018) (holding that "the suspicious timing of the termination," which came one week after the protected activity, was evidence of pretext); *Hurlbert*, 439 F.3d at 1298 (concluding that the "no more than two weeks" between a request for leave and the termination was evidence of pretext).

For those reasons, there is a genuine issue of material fact about pretext.

## IV.  CONCLUSION

The district court erred in granting summary judgment to Georgia Pacific.  Neither the manager exception nor the requirement that an employee's conduct relate to her current employer has any basis in the statutory text.  They are not a part of Title VII's opposition clause or participation clause.  Additionally, Georgia Pacific's proposed alternative grounds for summary judgment each fail.  Patterson exhausted her administrative remedies, and she has created a genuine issue of material fact on both causation and pretext.  For those reasons, the grant of summary judgment is REVERSED.

**REVERSED AND REMANDED.**[3]

---

[3] Kurt Kastorf was appointed by this Court to represent Patterson in this appeal.  His acceptance of that appointment and his representation of her are in the finest tradition of the bar.