[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13283

Non-Argument Calendar

_____

HARRY W. TOLLEY, JR.,

Plaintiff-Appellant,

*versus*

MERCER UNIVERSITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-02453-VMC

_____

Before NEWSOM, GRANT, and ANDERSON, Circuit Judges.

PER CURIAM:

Dr. Harry W. Tolley, Jr., a white man, alleges that Mercer University racially discriminated against him by rejecting his application for an open position on the faculty of Mercer's McAfee School of Theology in violation of Title VII and 42 U.S.C. § 1981. Tolley has aired evidence tending to show that Mercer's hiring process was infected with an invidious focus on the race of the candidates. But because he cannot show that the decisionmakers at Mercer ever knew Tolley's race specifically, his discrimination claims cannot survive. We accordingly affirm the district court's grant of summary judgment for Mercer.

**I.**

In 2018, a tenure track position for a professor of New Testament Studies opened at the McAfee School at Mercer after the incumbent, a black man, retired. At that time, McAfee served a student population that was approximately fifty percent black. By contrast, only two of McAfee's twelve faculty members were black, including the retiring professor. McAfee's accreditation agency had recently flagged this disparity and urged the school to close this gap by adding greater racial diversity to its faculty when conducting new hiring. The New Testament Studies position was the first opening on the faculty following this recommendation.

To fill the position, the interim dean of McAfee, Gregory DeLoach, appointed three faculty members to serve on a search

committee: Dr. Karen Massey, Dr. Dave Garber, and Dr. Nancy deClaissé-Walford.  DeLoach himself attended the vast majority of the committee's meetings and frequently contributed to its discussions, though he did not formally have a vote.  This committee established qualifications for the position and posted a formal job description on Mercer's HR website in September 2018. A total of 109 candidates applied, including Dr. Tolley.

Tolley's formal credentials for the position included a Ph.D. in the New Testament and Ancient Mediterranean history and archaeology, several publications, and multiple adjunct professorships.  He was also distantly related to a current faculty member at McAfee, Dr. Loyd Allen.  The two spoke over the phone about the open position.  According to Tolley's notes, Allen told him that he assumed that Tolley, whom he had never met, was a white man.  Allen told Tolley that this fact would likely hurt Tolley's candidacy because "being female and a person of color" were advantages for being hired by McAfee.  He further admitted, per Tolley, that McAfee was intent on hiring a black person to replace the retiring black faculty member.  Though Allen did not serve on the search committee, he promised to vouch for Tolley. He followed through by telling Garber, a committee member, that the two had spoken.

To pare down the candidate pool, each committee member first individually reviewed the applications before convening as a group to discuss the standouts.  Though Mercer's HR department collected demographic data from applicants for statistical purposes,

this information was not passed along to the search committee. The applicant files that reached the committee thus did not systematically contain any information about the candidates' race.

In at least some cases, however, the committee was aware of—and considering—applicants' race when reviewing their files. For example, some applicants explicitly self-identified their race in their cover letters. In one case, Dr. Walford emailed the other members of the committee flagging the application of "a really nice white guy" with whom she was personally familiar, but recommended against interviewing him, stating that she "like[d] him very much. But he is a white male . . . sigh!"

Ultimately, the committee invited fourteen applicants to interview. Dr. Tolley was not one. No committee member could independently remember why he had not made the cut, but after re-reviewing his application during this litigation, they testified that, although Tolley had met the formal qualifications for the position, the committee members did not believe his research focus aligned with their pedagogical goals for the position, among other drawbacks. Tolley did not mention his race in his application materials, and all members of the committee submitted sworn affidavits in this litigation that they were not aware of his race when evaluating his candidacy.

After conducting interviews, the committee narrowed their search down to three finalists, each of whom was invited to McAfee to deliver a guest lecture and meet with faculty and administration members. Following these visits, the search committee eliminated

one finalist from contention due to her relative inexperience, then presented the others—a black woman and a white man who had just finished a two-year teaching fellowship at McAfee—to the full faculty for discussion and a vote. According to the committee members, both candidates had impressed during their visits.

Around this time, a faculty member not on the search committee emailed Dean DeLoach about diversity issues at the school. This professor exhorted DeLoach to "invest in radical change on the racial front at McAfee" by strategically maneuvering incumbent faculty into early retirements so that McAfee could "hire not just one but a critical mass (2-4) of black faculty" to replace them. DeLoach thanked this professor for his "impassioned and important note," responding that "all things being equal a person of color would be preferred" for the open position. He also noted that, though the search committee preferred to hire the black finalist, the situation was "extraordinarily complicated" because students at McAfee—including, DeLoach specifically noted, several black students—had circulated petitions supporting the white finalist.

Two votes of the McAfee faculty were held. After the first, which was inconclusive, the faculty held a discussion about the two finalists before voting again. Dean DeLoach's notes from this meeting reflect that race featured prominently in multiple faculty members' judgments. One professor said of the black finalist, "her race is a plus." Another noted that her being black would help connect McAfee with local "black churches" and that she would be

a good complement to the only other black member of McAfee's faculty.  The discussion of the white finalist's race was much more equivocal.  While student comments defended him as a "white guy that gets it" and as "working on his whiteness," some faculty members derided him as the "embodiment of white" which "may be problematic" and noted that McAfee "need[s] more diversity." The faculty also discussed McAfee's accreditor's recommendation that McAfee hire more black faculty to better match its student body demographics.

In the end, the black finalist won the second vote overwhelmingly and was offered the position.  Contrary to Mercer's document retention policy, which requires employees to maintain all job search related materials for three years, Dr. Massey and Dr. Walford prematurely destroyed the handwritten notes they had accumulated during their service on the search committee.

Tolley sued Mercer under Title VII and 42 U.S.C. § 1981, alleging that McAfee had rejected his application for the professorship because he was white.  After discovery, the district court adopted the magistrate judge's recommendation that Mercer be granted summary judgment.  This appeal follows.

## II.

We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in their favor.  *Sutton v. Wal-Mart Stores East, LP*, 64 F.4th 1166, 1168 (11th

Cir. 2023).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III.

Tolley argues that Mercer discriminated against him on the basis of race in violation of Title VII under both a single-motive and mixed-motive theory.[1]  Under a single-motive theory, a plaintiff typically proves discrimination through circumstantial evidence using the *McDonnell Douglas* burden-shifting framework.  To succeed, the plaintiff must first establish a prima facie case of discrimination.  *See Patterson v. Georgia Pac., LLC*, 38 F.4th 1336, 1344–45 (11th Cir. 2022).  In a traditional failure-to-hire case, the plaintiff establishes a prima facie case by demonstrating that: (1) he was a member of a protected class; (2) he applied and was qualified for a position for which the employer was accepting applications; (3) despite his qualifications, he was not hired; and (4) the position remained open or was filled by another person outside of his protected class.  *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002).

By establishing a prima facie case, the plaintiff creates a rebuttable        presumption        that        the        employer        unlawfully

---

[1] Tolley also argues that Mercer discriminated against him in violation of § 1981.  Because discrimination claims under § 1981 are analyzed using the same analytical framework as single-motive Title VII discrimination claims, our analysis under that statute applies equally to both.  *See Lewis v. City of Union City*, 918 F.3d 1213, 1220 & n.5 (11th Cir. 2019) (en banc).

discriminated against him. *Id.* at 1272. The burden then shifts to the employer to rebut this presumption by producing evidence that its action was taken for some legitimate, nondiscriminatory reason. *Id.* If the employer meets its burden of production, the presumption of discrimination is rebutted, and the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination. *Id.* at 1272–73.

If the employer's stated reason for its action is legitimate—in other words, if it might motivate a reasonable employer to act—then to show that it is pretextual, the plaintiff must address "that reason head on and rebut it." *Patterson*, 38 F.4th at 1352 (quotation omitted). A plaintiff cannot rebut a reason "by simply quarreling with the wisdom of" it. *Id.* (quotation omitted). Instead, he must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" such that a reasonable factfinder could find the employer's offered reasons "unworthy of credence." *Id.* (quotation omitted).

As an alternative to the *McDonnell Douglas* burden-shifting framework, a plaintiff can also survive summary judgment on his single-motive discrimination claim if he presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). While plaintiffs are not limited to particular forms of circumstantial evidence, our cases have identified three, nonexclusive categories that can raise a reasonable inference of unlawful conduct: (1) "evidence of suspicious timing,

ambiguous statements, or other information from which unlawful intent may be inferred;" (2) "evidence of systematically better treatment of similarly situated employees;" or (3) "evidence that the employer's justification for its action is pretextual." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 2023 WL 7095309, at *6 (11th Cir. 2023).

Unlike with a single-motive discrimination claim, a claim of mixed-motive discrimination under Title VII requires a plaintiff to show that illegal bias was a "motivating factor for an adverse employment action, even though other factors also motivated the action." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (quotation omitted). To survive summary judgment, a plaintiff must offer "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was *a* motivating factor for the defendant's adverse employment action." *Id.* at 1239 (alteration adopted and quotation omitted).

With respect to Tolley's single-motive discrimination claim, the parties on appeal have briefed only the issue of pretext. In the *McDonnell Douglas* analysis, we therefore assume that Tolley stated a prima facie case of discrimination and that Mercer's proffered explanation—namely, that Tolley's research agenda did not fit McAfee's vision for the position—adequately rebutted it. In the convincing mosaic analysis, we ask whether Tolley has presented enough evidence to permit a jury to infer intentional

discrimination.  We focus, as the district court did, on the issue of Mercer's knowledge of Tolley's race.

At the pretext stage, "our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).  To show that the members of the search committee acted with the requisite discriminatory intent, Tolley must prove a threshold fact: that they actually knew what race he was when they decided not to hire him.  Without that knowledge, Tolley cannot show that Mercer's explanation for not hiring him was pretextual, because "racial discrimination is an intentional wrong" and an "empty head means no discrimination." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) (alteration adopted and quotation omitted).  Accordingly, "an employer cannot intentionally discriminate against an individual based on his [race] unless the employer knows the individual's [race]." *Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002).

Tolley, unlike other candidates, did not voluntarily disclose his race on his application materials.  Each of the three search committee members—Massey, Garber, and Walford—as well as Dean DeLoach submitted sworn affidavit testimony disclaiming any knowledge of Tolley's race before they struck his application. To rebut the conclusion that the search committee was unaware of his race, Tolley submits that, after he spoke to Dr. Allen about his application, Allen then spoke to Garber, a committee member.

Allen testified that he "probably" mentioned to Garber that he and Tolley were distant familial relations—specifically, that Tolley was Allen's cousin's niece's husband.  From this, Tolley argues that Garber would then have assumed that Tolley, like Allen, must be white.[2]

Tolley's argument fails in two respects.  *First*, Tolley can only speculate that Garber would have assumed from the fact that Tolley and Allen were distantly related by marriage that Tolley and Allen were the same race.  Such "unsupported speculation" will not defeat invocation of summary judgment against a plaintiff.  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (quotation omitted).  *Second*, Tolley provides no evidence to support the inference that, even if Garber suspected Tolley was white, this information was then communicated to Massey and Walford, the other two decisionmakers on the committee.  Absent evidence of actual knowledge, we cannot impute Garber's suspicions about Tolley's race to the committee as a whole.  *See Silvera*, 244 F.3d at 1261–62.[3]

---

[2] Mercer argues that the committee had most likely already rejected Tolley's application before he and Allen spoke, meaning that any statement by Allen to Garber played no role in the decision not to hire Tolley.  The record is not definitive as to the timing of these events.  Because we construe all ambiguities in Tolley's favor when reviewing the district court's summary judgment order, we assume that Allen's conversations with Tolley and Garber occurred before the committee struck Tolley's application.

[3] Tolley also argues that we should infer pretext from Dr. Massey and Dr. Walford prematurely destroying their handwritten notes about the search process.  It is possible that those notes would have revealed actual knowledge

Tolley also points to other pieces of circumstantial evidence that McAfee was intent on hiring a black person for the position. Specifically, he flags recommendations by McAfee's accreditor to diversify its faculty, an email from Walford characterizing a particular white applicant's race as a negative, a statement by Dean DeLoach saying they "preferred" to hire a person of color for the position, and comments from the faculty vote on the two finalists indicating that race heavily influenced the outcome. But these pieces of evidence, which carry varying weight in the pretext analysis, go toward the question of whether McAfee discriminated against white candidates whose race they were aware of. Without more, this circumstantial evidence does not defeat the committee members' sworn testimony disclaiming any knowledge of Tolley's race before striking his application.

Because Tolley cannot raise a triable issue of fact with respect to Mercer's knowledge of his race, summary judgment for Mercer on his single-motive discrimination claim was appropriate.

---

by Massey and Walford of Tolley's race. Deviations from an employer's standard procedures may serve as evidence of pretext. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006). But we generally will not draw adverse inferences from a party's failure to preserve evidence unless absence of that evidence is predicated on bad faith. *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). Tolley has provided no evidence rebutting the magistrate judge's conclusion that the professors destroyed their notes for non-nefarious reasons—essentially, spring cleaning. We are not obligated to make an adverse inference against Mercer about the content of these notes because Tolley has not presented any evidence that the notes were destroyed in bad faith, as opposed to out of mere negligence. *Id.*

So too with his mixed-motive discrimination claim: if Mercer never knew Tolley's race, it cannot have been a motivating factor in Mercer's decision not to hire him.

We do not discount the evidence uncovered by Tolley during discovery of Mercer's relentless focus on race. But whether the committee racially discriminated against other white applicants—indeed, whether they *would have* racially discriminated against Tolley had they known he was white—does not bear on whether the committee *did* unlawfully discriminate against him here. Employment discrimination "is about actual knowledge, and real intent, not constructive knowledge and assumed intent." *Silvera*, 244 F.3d at 1262.[4]

\* \* \*

We **AFFIRM** the district court's grant of summary judgment in favor of Mercer.

---

[4] Because we affirm the district court's grant of summary judgment to Mercer on the ground that Mercer did not know Tolley's race, we need not address the parties' arguments as to whether the ministerial exception would apply here.